This is our next case of the morning. The Board of Trustees of the University of Illinois v. Illinois Educational Labor Relations Board for the appellant, Mr. Powers. For the appellee, Ms. Hanson. And Mr. Jokic or Jokic? Jokic. Jokic? Yes. And you're both arguing and you've got your time divided and so forth. You may proceed. May it please the court. While the University believes that the 30 chairs at the Springfield campus are supervisors, I will be devoting the majority of my comments today to addressing the IELRB's clearly erroneous conclusion that the chairs are not confidential nor managerial employees within the meaning of the Illinois Educational Labor Relations Act. Focusing first on the managerial status of the chairs, I think it's important to clarify what is not at issue. When you read the Ed. Board's decision and you read the briefs of the appellees, there's really no dispute regarding whether or not the chairs actually engage in managerial and executive functions. The evidence is replete with those types of duties ranging from budgetary decisions to work scheduling decisions. And the Ed. Board doesn't really contest that. There is also really no dispute that the chairs have the responsibility, actually have been endowed with the responsibility and the expectation of running their departments. The Board itself... We should just stop, shouldn't we? Well, no. This is where we get to the issue. The Board itself quotes from the statutes that the chairs are responsible for the formulation and execution of departmental policies and the execution of university and college policies insofar as they affect the department. That is right in the university statutes. What the disagreement between the university and the appellees really comes down to, then, is one of independent judgment and one of collaboration. It's really the gist of the Ed. Board's argument as to why the chairs do not qualify as managerial employees. The university believes that they are misreading the statute and this court's own case law. This court in a 2011 case involving the Illinois Labor Relations Board and involving a managerial definition in the Public Labor Relations Act that is identical to the definition found in the Ed. Act, very clearly found that there is no requirement in the managerial definition requiring independent exercise of managerial discretion and authority or exclusive. In other words, it's okay if an individual actually participates or collaborates with subordinates or other individuals to actually make a decision, as long as at the end of the day that individual has the independent judgment to decide on his own or her own how to make a decision regarding one of those managerial decisions. And what the university would submit is that taking the appellee's interpretation of the managerial definition to its logical extreme would soon lead to absurd results. The university submits that if it is that easy to destroy one's managerial oversight by simply voluntarily collaborating with subordinates or fellow managerial employees, nothing would stop any employee from self-removing themselves or endowing themselves with collective bargaining rights under the statute by simply, whenever they have an obligation or an opportunity to make a decision, that they will simply go and collaborate with subordinates or with other individuals. That can't be the right interpretation of the statute. Let me ask you a question. Yes. Would that vary? Could that vary from campus to campus? It could. And that you could have department chairs whose style of management made them 99 and 4400 percent collaborative. The department liked that. The dean doesn't object. But the department chair over in the College of Fine Arts is the opposite. Doesn't want to be collaborative or is mildly collaborative but exercises more the function that you might describe. Well, let me clarify my comment when I said it could differ from campus to campus. As long as management makes it clear to the chairs that they have the decision-making authority in the first instance, it really shouldn't matter the extent of collaboration, whether it's 99 percent or 1 percent. What I meant to say is that if management directs the chairs, let's say, at another campus, you will have no discretion. You need to check with us. You need to check with your subordinates. That's where there's no record in the evidence whether there might be differences at the other campuses. Well, I mean campuses in general, of state universities, not just the ones. Oh, absolutely. I mean, that goes without saying that it would depend on what the managerial guidance and direction that ISU or Western Illinois or Eastern Illinois gave to their chairs. So would you concede that the result could be different in another case? It could be different, yes. The decision that you're going to be rendering today is limited to the 30 chairs at the Springfield campus. It's not going to have any effect on the Champaign-Urbana, the UIC campus, or any other college campus here. Until they bring it up. Until the chairs decide to file a petition with the Ed Board. Right. Right. So at the end of the day, just wrapping up the discussion, because I really do think it comes down to a matter of statutory interpretation regarding the definition of managerial in the Ed Act. At the end of the day, we believe that the appellees have overstated even the extent of collaboration that's outlined in the university statutes. They point to various quotes in the statutes that empower or assign various educational policy responsibilities to the faculty. And that is true. There are those various quotes in the university statutes. You need to read the statutes in their entirety. At the end of the day, each and every one of those opportunities that the university gives faculty to participate in decision-making, at the end of the day, is subject to the ultimate responsibility and decision-making of the Board of Trustees. Just a few examples that I found in the statutes. When there's descriptions about the Faculty Senate, they're responsible for educational policy. Subject to the approval of the Board of Trustees. Creation of department bylaws. There was some discussion during the hearing and in the briefs about the fact that the faculty themselves create the bylaws for their departments. There's a caveat that says that as long as nothing in those bylaws conflict with the statutes or directive of the Board of Trustees. And at the end of the day, the chairs themselves have to be approved and have to be assigned by the Board of Trustees and the deans. From our perspective, that is the deciding factor. That shows that the university views the chairs as an arm of management, as their eyes and ears for exercising managerial authority at the department level. Reduced to its essence, the Board has found no managerial status simply because the chairs voluntarily choose to collaborate and consult. There is contrary evidence in the record that other chairs actually do not collaborate to the same extent as their fellow chairs. There is evidence that sometimes for adjunct faculty decisions, chairs will not consult with their subordinates. There is evidence in the record that certain chairs will not consult when it comes to work scheduling, class schedules. There is evidence in the record that chairs will not consult or will decide for themselves whether or not to approve budgetary funds for certain tools in the department. So the record shows that chairs do get to decide for themselves based on their own personalities, based on their own managerial style, to what extent they will decide to collaborate with their subordinates. And for those reasons, we believe that the Ed Board's decision regarding managerial employees was clearly erroneous. That they do actually exercise the independent judgment and meet the two prongs of the definition of managerial. Turning briefly to the confidential employee discussion. In that respect, the IELRB, we believe, has subtly switched its legal argument. When you read the Board's original decision, it makes it sound like any type of grievance information that is developed at the first step of a grievance process, or any grievance information at all, doesn't qualify as confidential. When you read the Board's brief, they seem to have taken a step back. And they now qualify their position. And it seems that they're saying that only low-level types of low-level grievance information is not confidential. In making this argument, the Board has misread Illinois judicial and administrative case law. The University has not been able to find a single decision that stands for the proposition that only high-level grievance information can be confidential. Their logic dictates there is a host of information that can be developed at the first level of a grievance process that can be confidential for purposes of the Confidential Employee Act. And that really comes down to the authority that the first step grievance adjuster has for deciding and analyzing a grievance. Depending on the bargaining unit and contract, grievance disputes at a first step could implicate a variety of topics. And this Court can take judicial notice of that. Collective bargaining agreements have sick leave provisions, payment provisions, work scheduling provisions. When an individual is assigned at the first step of the grievance process, that individual is an agent of the University. And that agent is responsible for analyzing and developing a response to the grievance. The Ed Board, in its decision, conceded and assumed that the chairs, in this case, would ultimately one day become the first step of the party's grievance arbitration process. What the Ed Board went on to say, though, is that the information that the first step chairs would then glean and obtain during that process doesn't rise to the level of confidential information. What that overlooks is the following fact. When a first step decision maker is looking at a grievance, analyzing it, and deciding to develop a response, that first step decision maker is privy to his or her own logic, analysis, weighing the pros and the cons of the grievance, such that if a union would go to that chair, if the union went to a bargaining unit chair and said, please share with me what your analysis is regarding this grievance. Do you think we have a good case? What, if any, weaknesses were you able to locate and identify in the university's case? You are now putting that chair in a very difficult position, and you're dividing that chair's loyalties when it comes to whether or not they should cooperate with the union and share that confidential information or withhold that confidential information because they are an agent of the university and say, no, I'm not going to talk to you about that. I'm going to control the flow of information between ourselves. I would like to quote a statement from an administrative law judge from the Illinois Labor Relations Board. It's a non-precedential decision, but it highlights this rationale about a first step grievance adjuster having access to the confidential information in his or her own mind. And I quote from this administrative law judge's decision involving Northeastern Illinois University. The release to bargaining representatives or individuals of internal information regarding reasons for grievance denial or discipline decisions never intended for such release, as well as recommendations, would necessarily place bargaining representatives in the position of knowing ahead of time possible decisions and, perhaps more importantly, in the position of sometimes impeaching labor contract administration by an employer by citing the employer's agent's own preliminary thoughts. This is why the university believes that the chairs do qualify for confidential employee status. The university introduced sufficient evidence in the record to establish the fact that there was a reasonable expectation that the chairs would become the first step of the grievance process. And the minute you accept that notion, that they are going to be the first step of the grievance process, they are going to be privy to all of their own thought processes and all of their own analyses when it comes to grievance. These grievances could be significant. They could involve significant sums of money. They could involve significant organizational decisions involving the university, scheduling decisions, what have you. And for the chair to be put into that difficult position of deciding whether to share or not to share that information with fellow bargaining unit employees is the crux of why they qualify as confidential employees. Let me just summarize my arguments and conclude with the following thought. In the end, the board and union's interpretation of the managerial and confidential status definitions are unreasonably narrow. Not unlike a prior labor board case that this court reviewed in 2011 involving AFSCME in the state of Illinois. In that case, Central Management Services versus ILRB, the number 090966, the labor organization claimed that the vast majority of state employees, except for the governor and his policy team, would fall outside the supervisory, managerial, and confidential employee exclusions under the Illinois Public Labor Relations Act. Just as this court rejected that overly narrow statutory interpretation, so too should this court avoid a result that would prevent the university from having daily management oversight for the 350 plus faculty members and graduate assistants at the university's Springfield campus, which in turn would leave the supervisory and managerial oversight for that large group to one chancellor, one provost, and four deans, spread across approximately 30 academic departments at the campus, resulting in approximately a management to subordinate rate of approximately 1 to 90. Even in the higher education context, the university submits that such a ratio is unworkable and unsustainable. And for all those reasons, as well as the reasons in our brief, the university would submit that the ed board's decision should be reversed and that these 30 chairs should be excluded from the bargaining unit in question. I have an additional question. Could you describe to me what your position is regarding non-tenure track faculty, adjuncts, and graduate students in relation to department chairs? In relation to the managerial supervisory aspect of the argument. Adjuncts, first of all, are clearly a subordinate. They work in the department and they fall under the auspices of the chair. The evidence is undisputed and the ed board agreed in its decision that chairs have the power and the authority to make hiring decisions when it comes to adjuncts, as well as effective discharge decisions. Discharge in the sense of if the chair decides that the performance of the adjunct is not up to par. Poor student reviews, poor interpersonal skills, poor writing skills, what have you. That chair has the ultimate authority to decide not to bring that person, that adjunct, back for the next semester. Now that's not only a supervisory indicia, but that is also a managerial indicia. And the reason it's managerial, and there's cases that say this, is the reason that chair is making those decisions is not just because the chair is a supervisor, but the chair has a responsibility for making sure that the department runs smoothly. That chair has a responsibility that students are getting the best education possible and that they're going to be able to achieve their ultimate goal of getting a degree. So that chair has to make sure that the right competent staff are there at the department providing educational services. That is part and parcel of the overall chair's managerial duties and responsibilities pursuant to the statutes. Does the department chair play a part in the acceptance of grad students and then in assigning grad students duties, whatever, to assist them in paying tuition? Do they receive monetary remuneration or benefits as being graduate students? Well, that's not in the record. What is in the record are the graduate students at UIS are themselves part of a collective bargaining unit. And their terms and conditions would be governed by that collective bargaining unit, collective bargaining agreement. But what the record does contain is that chairs indeed serve in a supervisory and managerial role vis-a-vis those graduate students by deciding when to hire a graduate student into the department, whether they need a graduate student or not, and then evaluating how well that graduate student is performing. Whether the chair does it himself or herself, or whether the chair delegates it to somebody else, the chair ultimately has to decide whether to retain that graduate student or let that graduate student go after the semester. How about a faculty member saying, I would like that graduate student to assist me? Would the department chair be the one that would assign that graduate student to a particular profession? Ultimately, it would be the chair's decision whether to approve or disapprove that retention of that graduate student, yes. Now, what you'll probably hear is that some chairs may decide to collaborate with their faculty and find out whether or not that that will be a good fit. But, yes, at the end of the day, the university maintains its chair's decision. And there may be some consultation then with higher level deans as well. Thank you. May it please the Court, I'm Assistant Attorney General Christina Hansen on behalf of the Illinois Educational Labor Relations Board. By title alone, department chairs seem like the type of high-level position that is aligned with management. But to be excluded from bargaining under the Act, the university was required to show that chairs fell within one of the three statutory exclusions, that they were confidential employees, managerial employees, or supervisors under the Act. The university here failed to do so. As the Board found, under the university statutes, the faculty itself is the responsible party in the teaching, research, and scholarly activities of the university. The statutes provide that each college or other academic unit shall be governed in its internal administration by the faculty, pursuant to bylaws that are established by the faculty. Under the shared governance model, chairs work with the faculty of their department in operating the department. As Dean or Manager described it, they are a spokesperson for the department and expected to take a leadership role in making sure that the department completes its responsibilities and communicates information to the university. But in that role, they represent the department to higher levels of university management, not the other way around. As the university statutes provide, chairs act independently only in such matters as are delegated to them by the department's executive committee. Their authority to exercise independent judgment thus emanates from the faculty itself, and they work collaboratively with the faculty to make those decisions. Their role is not in directing the faculty, it is in coordinating the work of the department with the faculty. Additionally, it's important to note that chairs often rotate terms such that tenured faculty members take turns assuming those responsibilities. If a tenured professor's chair term ends, that chair goes back to being a regular tenure system faculty member. What about the department chair that's particularly popular with the dean, and as far as the faculty are concerned, there's no movement to replace them? Could a department chair have some longevity? Sure, they could. They typically serve a three-year term, but they can serve multiple three-year terms. But ultimately, the faculty can choose to remove their chair. They can vote their chair out. And the selection of a chair is subject to dean approval, but it's generally done by vote of the faculty. How about the removal? Is that subject to the dean's approval also? I believe that it is. And does the dean also have the power to remove a chair without input, well, maybe with input, but without honoring what the faculty might want? I think the decision of actually selecting the chair is put to a vote by the faculty. I'm asking, you've got a chair. The dean thinks they're not doing their job. Can a dean remove the department chair even if the faculty has not taken a vote on it or they're not even consulted about it? There's no evidence of that in the record. There's no evidence that the dean could do that in the record. The evidence in the record suggested that chairs have done that. They have made the decision to remove a chair and appoint a new one and have informed the dean that they made that decision. But there's nothing in the record indicating that the dean could decide. Is there anything in the record about the chancellor or provost or dean calling the department heads together and saying, hey guys, and you might not have it in this instance with this particular campus. Fundraising is an issue. Department chairs, because they are the voice and face of that department, are going to have to begin to engage in fundraising and friend raising in addition to urging faculty to do the same. Is there anything in the record like that? Or that that being a responsibility that's delegated down or directed down from deans or the provost? Not that I'm aware of. I guess I'm not really sure. Can the higher levels of administration say that there's a particular function that they want the department to do? I mean, you could say department chair do it. Sure, but it would be a collaborative process among the department faculty. Do you think faculty would be enthusiastic about fundraising and friend raising? No. I'm not really sure I understand your question. Well, since universities now probably receive less than 20% of their funding from the state, even universities that are well off with funds sometimes find it necessary to engage in capital campaigns or fundraising efforts. And you can't just have that done. The movement is not to just have that done by development officers and presidents and provosts. The development is to have deans do it and department chairs do it because department chairs want unrestricted funds to spend on travel for graduate students or unrestricted funds to help with things going on in the department. And I'm asking if those, and it may be that that didn't come up in this case, but that department chairs would have to take an active role in making sure that they and their faculty members engage the public in a fundraising campaign. Sure. That's not in the record, but from the evidence in the record and from the way that the university is structured and the university statutes are structured, if that is something that becomes the responsibility of the department, then the department would work, the faculty would work collaboratively. You're assuming that they would work collaboratively. Or would the dean tell them, you have to come to these cocktail parties that we're having with potential donors? Sure. And the dean as a part of higher administration would have the authority to do that. And the department chair is the one that has to effectuate it. Well, the department faculty works collaboratively And the dean would have only that authority given to it by the department faculty to determine how that department was going to represent itself and accomplish the objectives that higher levels of university administration have acquired of it. And that is why chairs are not managerial employees. The hallmarks of manager status are final responsibility and independent authority to establish and effectuate policy. And the consequent alignment of that employee's interest with management. And there was no evidence of that in the record here. Rather here, the chairs were part of their department and representing their departments up to higher levels of university administration. What percentage of faculty are not in a bargaining unit? Are the non-tenured faculty in a bargaining unit? They are. They're in a separate bargaining unit. And then there's a separate bargaining unit for the tenure system faculty. Does the department chair have more authority over the non-tenure track faculty than the tenure track faculty? The non-tenure system faculty being the adjunct faculty? Yes, adjuncts. The board did find that chairs have the authority to hire and retain adjunct faculty. What percentage of the faculty on campus in these 28 departments or 28 department chairs, what percentage of the faculty is non-tenure track or adjunct? It varies from department to department. Some departments, such as the history department. I'm talking about the total. I looked at it and just guessing the percentage, 40 plus percent of the faculty that are being supervised by department chairs as a whole are non-tenure track. I think that's about accurate. Yeah, it might be 37 percent or 42 or whatever. Sure. Would you agree that that's significant? It is, and it varies from department to department. Sure. But even to the extent that chairs exercise independent authority in hiring and retaining faculty, still that role is not uppermost in importance and influence in their position. The university has to hire adjuncts because they can't afford tenure track. They do, but you have to look at the responsibilities of the chair itself. Most of the chairs testified that only about a third of their employment time is spent on chair responsibilities, with the other two-thirds going to their regular teaching and learning services. But some of the department chairs said it was more than 50 percent. One of the chairs said that. One? Only one said that it was more than 50 percent. The average was about a third of their employment time. And so when you couple that with the sort of non-managerial, the non-adjunct, the responsibilities that the chair has with respect to chair duties that are not related to their responsibility in hiring and retaining adjuncts, then it becomes clear that the hiring and retaining adjuncts is not uppermost in importance or influence with respect to their job responsibilities. I'd also like to briefly address the point that counsel made about confidential employees. Your time has expired, but I'm going to let you speak on that for just a moment. Okay. Involvement in the grievance process alone does not establish that an employee is confidential. The university points to a board decision, which is actually an ALJ decision, and as he indicated, it's non-precedential. It's important to note that in the case that he cited, the employees at issue were already determined to be supervisors. They already had authority to discipline employees and also to adjust grievances. And so the determination that they were confidential employees is based in part on those factors, which is different than what we have here. Tenure system faculty members are not subordinates of the chair. They are colleagues of the chair. And there's nothing in the record indicating that chairs have any authority to discipline other faculty members. And there's no evidence suggesting a reasonable expectation that they would actually be adjusting grievances and therefore obtaining the type of confidential information that would make them confidential employees. All right. Thank you. Your side will have more time to revolt. Or no, you won't. My mistake. May it please the Court, my name is Steve Helkitsch, and I represent the employee of the University Professionals of Illinois Local 4100. So I think that the easiest way to conceptualize this case is to take a look at what the undisputed evidence is with respect to what chairs do. Chairs have faculty appointments. Almost every chair spends at least half of their time teaching. And all of the chairs who testified, including the chairs called by management, had active research and service responsibilities. Now, in addition to that, there are some duties that chairs have that are different than faculty, but that are not supervisory. So, for example, chairs have more responsibilities with respect to faculty advising. And faculty advising is a core faculty obligation under University of Illinois statutes and under the faculty personnel policy. Chairs are responsible for pushing paper. They're responsible for keeping the faculty personnel process on track, even though they don't have any more voice than other faculty members in terms of who gets hired to a regular position, who gets promoted, and who gets tenured. So if you add those things up, the question that you have is whether the university has carried its burden of showing that the preponderance of their employment time or their predominant duty is supervisory or managerial. And whether you can say that the decision of the administrative agency, which weighed these facts, weighed the conflicting testimony, weighed the impact of the university statutes, is clearly erroneous. And I submit, given the undisputed facts about what virtually all chairs do with their time, really support the decision of the administrative agency and surely refute any allegation that the administrative agency was clearly erroneous when it decided that they were not supervisors in this case. They teach, they do research, they do service. And in addition to that, number one, in most departments they rotate. We had a couple of long-serving chairs who testified, but in most departments they rotate. And then number two, the faculty in a department can get rid of their chair if they don't like it. And we even had a concrete example of that in the testimony in this case where the Department of Legal Studies met. They decided they didn't like their chair. They decided to take the chair out of the chairmanship, put somebody else in, and inform the dean's office,  and there was no evidence that the dean's office had any say whatsoever in what that department did. Is there anything in the record that shows the dean could have done otherwise? So if you look at the faculty personnel policy of the university on page 43, and I can get you a record site on that in a second, the faculty personnel policy is Employer Exhibit 8. And so the C site starts with 1169. Look on page 43. It says that either the department or the dean may initiate discussions to remove a department administrator. Normally requires concurrence of both the department and the dean. And it goes on to say in the event that a department votes to remove and the dean wants to retain the chair, the dean may ask for a second vote. If a simple majority of the department votes to remove, this is on the second vote, the process to appoint a new department administrator will begin. So that, given the evidence we have of how the Department of Legal Studies acted, I think that pretty clearly indicates that if the department puts their foot down, the dean has no choice but to appoint a different chair. What about a situation where the dean becomes disenchanted with the department's chair and wishes to discharge regardless of what the faculty thinks? There was no testimony in the record on that issue. So the only thing we have to go on is this clause that I just read. And in the clause that I just read, it says that removal normally requires the concurrence of both the department and the dean. So if the dean's really upset and the department says we love him, they would be at loggerheads. I don't think the dean would be able to do it because there's no provision. Why does it say normally? What? Why does it say normally? I thought that was the first thing. Well, it does say normally, you're right. Which means it's not exclusive. We had no evidence about how this actually works in practice. We only had evidence about how a department can remove a chair. Now, the other point that I would like to make is that the university council would have you believe that this is all a difference of management style, that some chairs are collaborative and some are hierarchical, and that it's really up to the chair to decide that. That statement is not true to the record. It is not true to the university statutes because the university statutes specifically deal with the power of the chair and the power of the faculty. And they say that the chair shall have power to act independently in such matters as are delegated to the chair by the executive committee of the department.  They further say that, for example, on budget, that the chair's job is to collaborate with the executive committee in the preparation of the budget and be responsible for the expenditure of funds for the purposes approved by the executive committee. And they further say that the chair, together with the executive committee, is responsible for the organization of the work of the department and for the quality and efficient progress of that work. The collaboration is not a function of management style. It's a function of university statutes. That's what the U of I requires. So in the case that arose on Sangamon State in the late 80s with the center directors, the court looked at the issue of managerial. And it said it was a close question because the center directors had half-time faculty appointments. In this case, the faculty have full-time faculty appointments. And the evidence shows that they spend most of their appointments, even as chairs, doing faculty duties. So I think that if you take the holding with respect to managerial... Wait a minute. You mean all of the department chairs or most of them continue to teach two or three classes a semester? Yes. Yes, and they continue to have active research agendas, and they continue to have service to the university community. But if you're a full-time faculty member, you'd be required to teach three. Is that correct? That's right. That's right. So if you only teach two as a department chair, your faculty responsibilities have been somewhat reduced. They have. Even though for purposes of research and advancement and educational purposes, you would do research or write. That's right. Okay. That's right. That's right. The point being that if you look at the word predominant in the definition of managerial, the court in the prior case in the fourth district held that 50 percent, boy, that was really close to predominant. And here the evidence quite clearly indicates that chairs have more than 50 percent faculty duties and a complete faculty appointment. Let me ask you the same question about the adjuncts. Yes. Was there any evidence where departments had more than the average or a lot of adjuncts? Was there any evidence about how that department functioned? Sure. Regarding the department chair saying we're only going to have four adjuncts this year, where we've had six or seven in the past, which means you're going to have to take up additional teaching loads. So the loads of regular faculty members are controlled by the faculty personnel policies, which say that the normal load is three. Which means you have to drop classes. I'm sorry. Really, I'm going to get to your point. I'm trying to get there. I'm just not as fast as you are, Judge. The loads are controlled by the faculty personnel policy. And the faculty personnel policy provides that if a chair wants somebody to teach an extra class, they can go to that person and ask. And if the person says, no, I don't want to do it, then the person can be given an overload assignment. And the evidence in the record was that in terms of regular faculty, it was always worked out. No chair ever had to tell a faculty member, you teach this class or you teach this overload. It would always work out. So in the departments with – there are some departments without any adjunct faculty, where the faculty take it upon themselves, jeez, we've got to have regular faculty for all of our students. But there are some departments with lots of adjunct faculty. And in those departments, the chair does have responsibility for determining, you know, who gets hired off of last year's list and who comes back from year to year. There was no evidence in this case with respect to the amount of time that discrete function took. And there was plenty of evidence that university-wide, chairs had responsibilities that – faculty responsibilities that well exceeded 50 percent. So if you take the lack of evidence put on by the university and the positive evidence put on by the chairs in this case, then your issue really is, is, well, did the administrative agency clearly err when it weighed that evidence? And I don't think you can say on this record. Your time has expired, counsel. Thank you. Can I say one thing about confidential? Yes. One thing. Because we actually pay attention to this. And I do appreciate that, and I apologize, Ron, I really do. The evidence in this case was that the university had proposed that chairs be the first step of the grievance procedure and that the union had proposed that they not. So all the evidence there is. I submit that leaves you at equipoise because you don't know who's going to win that contract argument. All right? And if you're at equipoise, it is, again, management's burden to prove the exclusion. And I don't think that the agency clearly erred when it determined that management had not carried that burden. Thank you. And thank you, Your Honor. I appreciate that. And Bob? Yes. Thank you. Just to clarify one or two things that were mentioned during the response. There is testimony in the record as to whether or not the dean can remove a chair. On page 318 of the hearing transcript, the provost, who was actually once a dean himself, Mr. Ermettinger, actually testified as follows. Quote, if the dean believes that the chair should be removed, they may discuss that with the department. The department may or may not agree with the dean, but the dean may still move forward and remove the chair. And at that point, an election for a new chair would take place. That is not contradicted. So just to clarify that point. One or two other points of clarification. I believe it was mentioned that the non-tenured faculty, such as adjuncts, are organized at UIS. They are not organized. They are not currently part of a bargaining unit. Up at UIC they are, but not at UIS. And also to address one or two other minor points. There was some talk just now about whether or not chairs rotate and the frequency with which chairs will ascend the position of a chair. It is varied. There was some testimony that in one of the departments, and I believe Steve was right, Legal Studies, that they actually had a practice of rotating. Because of the time commitment that the chair duties took, I think you heard testimony during the hearing, and you'll see that in the transcript, that certain faculty don't like to do it. It's a burden. It takes them away from their teaching responsibilities, and so they decided to share that. So after so many years, the faculty would vote another one of their own fellow members to actually ascend and be a chair. That is not how it's done in other departments. Other departments, they have very long-term chairs who everybody is comfortable with. The chair is comfortable with his duties, and that chair remains in that position long-term. The one piece of evidence that was cited about the department notifying the dean, I remember that discussion very clearly. I just reviewed it last night. The testimony on cross-examination was that the faculty did not know what, if any, review, or what, if any, interface there had been at the dean's level and above. So as far as the record shows, the dean approved the replacement of the chair. There is no indication that the department did it independent of or in lieu of the chair's oversight ability. With that, with those few points of clarification, I would just like to renew the university's request that the decision of the Ed Board be reversed and that these 30 chairs be excluded from the bargaining unit in question. Thank you. We'll take this matter under advisement.